UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
:
UNITED STATES OF AMERICA,
:
  -vs.-                                  **06 CR 616 (S-1) (RJD)**
:
PRATHEEPAN THAVARAJA, et al.,
:
           Defendants.
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**<u>DEFENDANTS' JOINT REPLY SENTENCING MEMORANDUM</u>**

CHARLES A. ROSS, ESQ.
Charles A. Ross & Associates, LLC
111 Broadway, Suite 1401
New York, New York 10006
Telephone: (212) 616-3030

FRAN OBEID, ESQ.
Obeid & Lowenstein, LLP
111 Broadway, Suite 1401
New York, New York 10006
Telephone: (212) 616-3040
*Attorneys for Defendant*
*Karunakaran Kandasamy*

SUSAN G. KELLMAN, ESQ.
25 Eighth Avenue
Brooklyn, New York 11217
Telephone: (718) 783-8200
*Attorney for Defendant*
*Vijayshanthar Patpanathan*

MICHAEL A. MARINACCIO, ESQ
Culleton & Marinaccio, Esqs.
245 Main Street, Suite 410
White Plains, New York 10601
Telephone: (914) 761-0707
*Attorney for Defendant*
*Murugesu Vinayagamoorthy*

WILLIAM J. STAMPUR, ESQ.
Hurwitz, Stampur & Roth
MICHAEL H. SPORN, ESQ.
EMMA M. GREENWOOD, ESQ.
299 Broadway, Suite 800
New York, New York 10007
Telephone: (212) 619-4240
*Attorneys for Defendant*
*Thavarajah Pratheepan*

JOSHUA L. DRATEL, ESQ
ALICE L. FONTIER, ESQ
Joshua L. Dratel, P.C.
2 Wall Street, Third Floor
New York, NY 10005
Telephone: (212) 732-0707
*Attorneys for Defendant*
*Nachimuthu Socrates*

BRUCE FEIN, ESQ.
Bruce Fein & Associates
1025 Connecticut Avenue, N.W., Suite 1000
Washington D.C. 20036
*Of Counsel*

TO:   LORETTA E. LYNCH, ESQ.
      United States Attorney
      Eastern District of New York
      271 Cadman Plaza East
      Brooklyn, New York 11201

      Attn.:  Jeffrey Knox, Esq.
              Assistant United States Attorney

**TABLE OF CONTENTS**

Introduction ....................................................................................................................................1

A.      *The Supreme Court's Decision in* Holder v. Humanitarian Law Project
         *Does Not Alter the Sentencing Landscape In This Case*........................................................3

B.      *Defendants' Political Beliefs and Activism May Not Be "Used for*
         *the Impermissible Purpose of Showing General Moral Reprehensibility"* .........................6

C.      *GOSL's Decisive Military Defeat of the LTTE Has Eliminated the LTTE*
         *As a Threat, and the Government Has Not Identified a Single Terrorist*
         *Incident Committed By LTTE or Any Successor Organization Since That Defeat*..............7

D.      *Governments and International Humanitarian Organizations Provided Aid*
         *to Sri Lankan Tamils Through LTTE During the Cease Fire Agreement Period*................9

E.      *Defendants' Motives and Objectives Are Relevant to Sentencing* …………………………. 11

*Introduction*

This Joint Reply Memorandum is submitted on behalf of all five defendants – Thavarajah Pratheepan, Dr. Murugesu Vinayagamoorthy, Vijayshanthar Patpanathan, Karunakaran Kandasamy, and Nachimuthu Socrates – in response to the government's July 1, 2010 Sentencing Memorandum as it pertains to the issues common to all defendants, which were addressed in defendants' May 7, 2010 Joint Sentencing Memorandum.[1]

The government's Sentencing Memorandum (hereinafter "Gov't Memo") declines to confront the vast majority of defendants' Joint Sentencing Memorandum. Instead, the government appears incapable of analysis beyond a description of defendants' offense conduct. Accordingly, in the context of this joint submission, little requires rejoinder. Nevertheless, what does demand reply is critically important in assessing the issues relevant to sentencing: what constitutes punishment, pursuant to 18 U.S.C. §3553(a), "sufficient but not greater than necessary" to achieve in this case, for these defendants, the four purposes of sentencing enumerated in §3553(a)(2).

In its Sentencing Memorandum, the government ignores altogether the history of the conflict in Sri Lanka between the majority Sinhalese and the minority Tamils, which in turn provided the reasons for defendants' overriding concern for the survival of their Tamil brethren in the face of Sinhalese oppression and brutality, and the context in which defendants committed their admittedly illegal conduct for which they have each pleaded guilty and accept responsibility.

Rather, the government would have history begin conveniently in July 1983, with the advent of the Liberation Tigers of Tamil Eelam (hereinafter "LTTE") as an organization pursuing violent and other means of resistance against the government of Sri Lanka (hereinafter "GOSL"). Not coincidentally, but not mentioned by the government, that month is also known as "Black July" because of the level of atrocities GOSL and its military committed against the Tamil population in Sri Lanka, especially in the Tamil areas of the Northeast.

Thus, the government would strip defendants' conduct – which they acknowledge was illegal – of *any* broader context. Yet sentencing, and in turn punishment, would be neither individualized nor just if it bypassed consideration of a defendant's motivation and purpose in committing criminal acts. Indeed, the failure to address those factors would render §3553(a) a nullity, and leave the statutory objectives of sentencing in a vacuum.

---

[1] In addition, defendants will separately address in individual Replies (submitted September 16, 2010) the government's Sentencing Memorandum as it relates particularly to each defendant.

1

After all, how is a court to determine what sentence is "sufficient but not greater than necessary" to achieve punishment, deterrence, incapacitation, and rehabilitation[2] unless it examines not only the offense itself, but also the circumstances and conditions under which it was committed, and what the defendant hoped to accomplish by its commission?[3]

In addition, in its Sentencing Memo, the government devotes considerable space to misconstruing defendants' arguments. For example, in its Sentencing Memo, at 38, the government contends that "[t]he Court's consideration of the nature and circumstances of the offense . . . should not credit the defendants implicit argument that their conduct should not have been classified as an offense at all."

Yet, as demonstrated by their pleas of guilty, and discussed in their Joint Sentencing Memo and further below, the defendants do *not* contend their actions were lawful; they do *not* contend that their motivations and purpose excuse them from criminal liability; they do *not* contend that the conduct to which they have pleaded guilty is protected by the First Amendment or any other constitutional provision.

Rather, fully cognizant that their conduct was illegal, but also conscious of the factors, set forth in §3553(a), that govern *sentencing*, and not merely the limited threshold issue of criminal liability, they simply provide a more complete, accurate, and proportional portrayal of the entire situation, thereby better enabling the Court to perform its sentencing function and impose a sentence "sufficient but not greater than necessary" for each defendant.

Cases that implicate charges of "terrorism," perhaps the most highly charged word in the contemporary vocabulary, correspondingly demand particular focus on the §3553(a) factors to ensure that sentencing is individualized, just, and "sufficient but not greater than necessary." Sentencing, as mandated by §3553(a) and 18 U.S.C. §3661,[4] is not a "one size fits all" function

---

[2] *See United States v. Siegel*, 271 Fed. Appx. 115, 118 (2d Cir. 2008) (stating) (internal quotations omitted) ("the purposes [of sentencing] to be considered include punishment, deterrence, incapacitation, and the provision of necessary medical care or other correctional treatment"); *United States v. Denardi*, 892 F.2d 269, 276 (3d Cir. 1989) (Becker, J., concurring in part and dissenting in part) ("the four purposes of sentencing set forth in subsection 3553(a)(2)"are "retribution, deterrence, incapacitation, and rehabilitation").

[3] *See, e.g., United States v. Adelson*, 441 F.Supp.2d 506 (S.D.N.Y. 2006), *aff'd*, 301 Fed. Appx. 93 (2d Cir. December 9, 2008) (noting that defendant's motivation was not greed, but rather to protect his business from the adverse impact of exposure of a fraud committed by subordinates).

[4] 18 U.S.C. 3661 directs that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the

even in cases involving charges implicating "terrorism." Rather, and especially in such cases, it must be careful *not* to punish more harshly than the purposes of sentencing require.

A.   *The Supreme Court's Decision in* **Holder v. Humanitarian Law Project** *Does Not Alter the Sentencing Landscape In This Case*

Contrary to the government's assertion, in its response, at 36, the Supreme Court's decision last term in *Holder v. Humanitarian Law Project*, ___ U.S. ___, 130 S. Ct. 2705 (2010), did *not* alter in any way the Court's consideration of any issues relevant to defendants' sentencing. As detailed below, analysis of *Humanitarian Law Project* (hereinafter "*HLP*") in relation to sentencing in this case demonstrates that the decision leaves the issues in exactly the same context they were before.

Defendants' position is *not* that their conduct was not criminal, or that it was protected by the First Amendment or the Fifth Amendment's Due Process clause – the two constitutional provisions at issue in *HLP*. Indeed, defendants have each *pleaded guilty*. In fact, by that time the Court had already denied defendants' motions in this case seeking dismissal on First and Fifth Amendment grounds.

Thus, any argument that *HLP* undermines defendants' sentencing presentation is a red herring, as defendants acknowledge, as they did during their allocutions, their criminal liability for their conduct, which fell outside First Amendment protection and, in Due Process terms, clearly violated the particular statutes at issue. Rather, the question is what impact these issues have on *sentencing*, *i.e.*, imposing a sentence "sufficient but not greater than necessary" to achieve the goals of sentencing enumerated in §3553(a)(2)(A)-(D).

In that context, defendants have raised issues regarding sentencing, *not* their offense conduct. That is why *motive* and *deterrence* are relevant. While the government refuses (for sentencing purposes) to evaluate defendants beyond their offense conduct and a simple Guidelines calculation, that does not constitute the requisite comprehensive analysis of *all* relevant §3553(a) factors, which the statute, the Supreme Court, and the Second Circuit have directed that a sentencing court shall consider.

Moreover, even the majority opinion in *HLP* did *not* eviscerate the First Amendment. The Court's opinion was in the context of a very narrow pre-enforcement facial analysis, which

---

United States may receive and consider for the purpose of imposing an appropriate sentence." *See also United States v. Concepcion*, 795 F. Supp. 1262, 1281 (E.D.N.Y. 1992) ("court should explore all relevant sources of information as mandated by §3661").

3

scrutinized only plaintiffs' proposed conduct and not the full permissible range of the statute.[5] *See, e.g.,* 130 S. Ct. at 2722 ("[t]he problem with [plaintiffs'] questions is that they are entirely hypothetical.  Plaintiffs have not provided any specific articulation of the degree to which *they* seek to coordinate their advocacy with the PKK and the LTTE.  They have instead described the form of their intended advocacy only in the most general terms. . . .  Deciding whether activities described at such a level of generality would constitute prohibited  service[s] under the statute would require  sheer speculation – which means that plaintiffs cannot prevail in their preenforcement challenge") (citation omitted) (emphasis in original).  *See also id.*, at 2729

---

[5] As the Court pointed out in the course of its Fifth Amendment Due Process analysis, the Ninth Circuit had erred because it

> contravened the rule that  [a] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others.  *Hoffman Estates* [*v. Flipside, Hoffman Estates, Inc*., 455 U.S. 489, 495 (1982)].  That rule makes no exception for conduct in the form of speech. *See Parker v. Levy,* 417 U.S. 733, 755-757 (1974).  Thus, even to the extent a heightened vagueness standard applies, a plaintiff whose speech is clearly proscribed cannot raise a successful vagueness claim under the Due Process Clause of the Fifth Amendment for lack of notice. And he certainly cannot do so based on the speech of others. Such a plaintiff may have a valid overbreadth claim under the First Amendment, but our precedents make clear that a Fifth Amendment vagueness challenge does not turn on whether a law applies to a substantial amount of protected expression.

130 S. Ct. at 2719.  *See also id.*, at 2721 ("[w]e emphasized this point in *Scales* [*v. United States*, 367 U.S. 203 (1961)], holding that even if there might be theoretical doubts regarding the distinction between 'active' and 'nominal' membership in an organization – also terms of degree – the defendant's vagueness challenge failed because his 'case present[ed] no such problem' ), *quoting Scales*, 367 U.S. at 223.

("[p]laintiffs' proposals are phrased at such a high level of generality[] that they cannot prevail in this preenforcement challenge") (citations omitted).

For example, the Court expressly and repeatedly noted that "[t]he statute makes clear that 'personnel' does not cover *independent* advocacy: 'Individuals who act entirely independently of the foreign terrorist organization to advance its goals or objectives shall not be considered to be working under the foreign terrorist organization's direction and control.'" 130 S. Ct. at 2715, *quoting* 18 U.S.C. §2339B(h). *See also id*., at 2726 ("[t]he statute reaches only material support coordinated with or under the direction of a designated foreign terrorist organization. Independent advocacy that might be viewed as promoting the group's legitimacy is not covered") (footnote omitted); *id*., at 2728 ("most importantly, Congress has avoided any restriction on independent advocacy, or indeed any activities not directed to, coordinated with, or controlled by foreign terrorist groups").

The Court added that "[u]nder the material-support statute, [plaintiffs] may say anything they wish on any topic." *Id*., at 2710. The Court included within that boundary of permissible conduct a person's ability to "speak and write freely about the PKK and LTTE, the governments of Turkey and Sri Lanka, human rights, and international law." *Id*. The Court also made clear that a person " may advocate before the United Nations[,]" citing *the government's* Brief for the proposition that "'[t]he statute does not prohibit independent advocacy or expression of any kind.'" *Id*., *quoting* Brief for Government at 13. The Court further pointed out – again citing and quoting the government's Brief for authority – that §2339B "'does not prevent [plaintiffs] from becoming members of the PKK and LTTE or impose any sanction on them for doing so.'" *Id., citing* Brief for Government at 60.

Ultimately, the majority opinion's concluding paragraph acknowledged that

> [a]ll this is not to say that any future applications of the material-support statute to speech or advocacy will survive First Amendment scrutiny. It is also not to say that any other statute relating to speech and terrorism would satisfy the First Amendment. In particular, we in no way suggest that a regulation of independent speech would pass constitutional muster, even if the Government were to show that such speech benefits foreign terrorist organizations. We also do not suggest that Congress could extend the same prohibition on material support at issue here to domestic organizations. We simply hold that, in prohibiting the particular forms of support that plaintiffs seek to provide to foreign terrorist groups, §2339B does not violate the freedom of speech.

130 S. Ct. at 2730.

5

Consequently, the government's attempts, in its sentencing memo herein, to penalize defendants for what the Court in *HLP* protected from proscription – independent advocacy on behalf of Sri Lanka's oppressed Tamils, or even membership in LTTE – are unavailing. Such conduct is *not* criminal, remains protected by the First Amendment, and should not be a factor at sentencing.

**B.**     ***Defendants' Political Beliefs and Activism May Not Be "Used for the Impermissible Purpose of Showing General Moral Reprehensibility"***

Indeed, as the Second Circuit explained in *United States v. Kane*, 452 F.3d 140 (2d Cir. 2006), "[a]lthough a given piece of evidence may be relevant in many ways, the government may not offer proof of a defendant's 'abstract beliefs' merely for the purpose of demonstrating that those beliefs, and by extension the defendant, are 'morally reprehensible.'" 452 F.3d at 143, *quoting Dawson v. Delaware,* 503 U.S. 159, 166-67 (1992).

While in *Kane*, the Court noted that "[t]he First Amendment 'does not erect a *per se* barrier' to the admission at sentencing of evidence regarding the defendant's beliefs or associational activity[,]" 452F.3d at 142, *quoting Dawson v. Delaware,* 503 U.S. at 165, it added that "[a] sentencing court may consider such evidence so long as it is 'relevant to the issues involved' in the sentencing proceeding. *Id.* at 164." *Id.* (other citations omitted).

The government's arguments here are completely unlike those in *Kane*, in which the defendant's public statements counseled (and boasted of) specific unlawful conduct – tax evasion – and provided advice on how to commit such crimes. 452 F.3d at 142-3. As the Court in *Kane* pointed out, the sentencing court limited its consideration to particular character issues the defense had raised, and "avoided considering [the defendant's] abstract beliefs for the irrelevant and impermissible purpose of showing general moral reprehensibility." *Id*., at 143, *citing cf. Dawson*, 503 U.S. at 166-67. The Court in *Kane* further noted that "because much of Kane's writings concerned illegal real estate schemes, which related directly to his offense of conviction, the writings also 'may indicate the increased likelihood of recidivism or a lack of recognition of the gravity of the wrong . . .'" 452 F.3d at 143, *quoting United States v. Tampico,* 297 F.3d 396, 403 (5th Cir.2002).

Here, in contrast, defendants' political beliefs and general activism on behalf of Sri Lanka's Tamils, and/or defendants' protected associational activity, discussed in the government's Sentencing Memo, at 11-15, constitute classic political speech, the type historically and still afforded and meriting the most protection under the First Amendment. *See Buckley v. Valeo*, 424 U.S. 1, 14 (1976) (per curiam). *See also* Geoffrey R. Stone, *In Perilous Times* (Norton 2004), at 10-11. As a result, the government's attempt to use defendants' political statements and activism to connect them to LTTE's terrorist philosophy and agenda is as futile as it is improper. The government's citation to defendants' statements of political philosophy,

abstract or otherwise, is not relevant to specific sentencing issues, but instead is designed for the "impermissible purpose of showing general moral reprehensibility." 452 F.3d at 143.

### C. *GOSL's Decisive Military Defeat of LTTE Has Eliminated the LTTE As a Threat, and the Government Has Not Identified a Single Terrorist Incident Committed By LTTE or Any Successor Organization Since That Defeat*

In its Sentencing Memo, at 5-6, the government erroneously asserts that LTTE "remains active." In fact, the government fails to identify a single consummated, attempted, or threatened LTTE act or incident in Sri Lanka or elsewhere since May 2009, when LTTE was conclusively defeated and the alleged successor to LTTE leader Vellupillai Prabharkaran was captured by GOSL. *Id*., at 5. Indeed, following Mr. Prabahakaran's death in 2009, Sri Lankan President Mahinda Rajapaksa declared, "today we have been able to liberate the entire country from the clutches of terrorism. We have been able to defeat one of the most heinous terrorist groups in the world."[6]

Nevertheless, in its Sentencing Memo, at 40, the government predicts that "the military defeat of the LTTE and the dissolution of its de facto government *will force* the organization to resort with greater frequency to the traditional terrorist activities it perfected years ago: suicide bombings and assassinations." (Emphasis added). Yet that constitutes sheer speculation, as the government relies on nothing but rhetoric to make that unsupported claim. Nor should the Court based its sentence on such unsubstantiated and wholly conditional prognostication, as it presumes that LTTE still maintains sufficient operational capacity, a claim belied by the facts on the ground in Sri Lanka: the 15 months since LTTE's defeat have failed to yield any evidence of LTTE terrorist activity or capability.

Also, while the government points to prosecutions in Europe with respect to fundraising, other, more recent, developments further demonstrate that LTTE has been eliminated as a viable organization both in and outside Sri Lanka. For example, the evolution of Kumaran Pathmanathan (a/k/a "KP") is both instructive and illuminating in that regard. An LTTE leader since the 1980's, and described alternately as "former arms procurer of the LTTE" and "the mastermind behind the arms procurement, shipping and financial networks of the LTTE abroad[,]" KP was appointed LTTE's Chief of International Relations in 2009 and, after the death of LTTE's leader (Mr. Prabharkaran) during GOSL's 2009 concentrated military offensive, KP assumed the helm of LTTE in its entirety. *See* "KP: Past Is the Past," *Business Today*, August 14, 2010, at 1 (a copy of which is attached hereto as Exhibit 1); B. Muralidhar Reddy, "Former LTTE Arms Procurer Agrees to Cooperate In Rehabilitation: Report," *The Hindu*, August 30, 2010 (a copy of which is attached hereto as Exhibit 2).

KP was arrested in Malaysia August 5, 2009, and was returned to Sri Lanka the following day. Subsequently, after he and others reportedly had "'now begun to understand the ground

---

[6] BBC.com, May 19, 2009, "Sri Lanka leader hails 'victory'," *BBC,* http://news.bbc.co.uk/2/hi/south_asia/8056752.stm (accessed on August 15, 2010).

realities[,]'" KP "agreed to cooperate with the efforts of the government to rehabilitate the . . . war-displaced Tamil civilians and help in the reconstruction of the war-ravaged northern province." *See* Exhibit 2.

In furtherance of that commitment, KP "organised a meeting of nine former rebels with the Sri Lankan authorities and pledged their support to the government's initiatives" regarding rebuilding the Northeast Tamil regions. *See* Exhibit 2.[7] The participants at that meeting decided to create an NGO, the North East Rehabilitation and Development Organisation ("NERDO"), administered by KP in conjunction with GOSL, that will "collect funds from the Tamil diaspora for the welfare of the war-displaced . . . [and] will also work towards creating awareness among the Tamils abroad on the post-conflict humanitarian programmes." *Id*.

KP's relationship with the Tamil diaspora is critical to his current mission, as well as to precluding the prospects for any LTTE revival. As KP stated in an interview, he "worked with the Diaspora for more than 25 years . . . with the Tamil community all over the world from Canada to Australia." *See* Exhibit 1, at 4. *See also id*., at 1 ("[d]uring his sojourns abroad KP built very strong ties with the Diaspora community and his influence on them is significant").

In addition to enlisting the elements of the Tamil diaspora to support NERDO's efforts,[8] KP's cooperation with GOSL has struck a fatal blow at any LTTE organizers outside Sri Lanka, as "[s]ince [KP's] arrest, several functionaries of the government have gone on record that he provided vital information on the LTTE network abroad." *See* Exhibit 2.

KP has also made clear the futility of continued armed conflict, and the recognition of that reality among Sri Lankan Tamils. *See* Exhibit 1, at 2 ("KP makes it clear that the arm[ed] struggle is over and that Eelam is not a reality. He emphasizes the past is the past"). *See also id*., at 7 (". . . where are we going to continue the arm[ed] struggle? In Norway or UK? The people in [Northeast Sri Lanka] will not allow the conflict to arise again. [Those abroad] cannot do anything or influence even one person in [Sri Lanka] to join in the arm[ed] struggle").

These important developments implicate the principle of deterrence, both general and specific. These defendants do not have prior criminal records; they have not pursued criminal lifestyles in the ordinary sense. The issues of specific deterrence are therefore diminished

---

[7] That delegation, which met in Sri Lanka with GOSL officials (including the Defense Minister and the Minister of External Affairs), included persons residing in Canada, Switzerland, Germany, the U.K., France, and Australia. *See* Exhibit 2.

[8] KP reports in the interview that he has "contacted [diaspora leaders] them personally and have started work. . . . [Leaders in Canada and Australia] have accepted the work [KP has] done to mobilise the Diaspora for rehabilitation and rebuilding the country, especially the North and East." *See* Exhibit 1, at 4.

8

considerably, particularly in light of LTTE's unavailability as a vehicle even if the defendants wished to resume their prior illegal activities.

Perhaps more importantly, though, because defendants' offense conduct was the result of rational choice – what specific means to pursue in support of the Tamils' struggle – their acute awareness of the consequences of pursuing *illegal* means in the course of that commitment reduces the danger of recidivism even more dramatically.

Those serious consequences regardless of the particular sentence imposed – criminal conviction, public humiliation, separation from family and friends, loss of employment, professional careers, and businesses, and an inability to assist Tamils in *any* useful manner while confined pretrial and/or after sentencing – also persuasively serve the purposes of *general* deterrence as well. No observer wishing to aid the Tamil cause would venture down this path in light of the impact of this prosecution on the defendants already.

Moreover, in light of LTTE's decimation and its leader's very public decision to abandon it and its violent agenda, general deterrence presents far less concern than it might otherwise under past or different circumstances. There are other, lawful means of aiding the Tamils of Sri Lanka, and defendants, like KP, recognize the advantages – both personally and for the benefit of Sri Lankan Tamils – of adhering to those legitimate methods in the future.

**D.**     ***Governments and International Humanitarian Organizations Provided Aid to Sri Lankan Tamils Through LTTE During the Cease Fire Agreement Period***

In its Sentencing Memo, at 16, the government in effect argues that *any* aid provided to Tamil territories after the December 2004 *tsunami* – which were the hardest hit by the disaster, and were essentially controlled by LTTE civilly and militarily – was motivated and designed to assist the LTTE and its violent terrorist activities. That assertion defies not only logic but, again, the facts as they existed during that period.

The *tsunami*, which occurred during the Cease-Fire Agreement ("CFA") (*see* Defendant's Joint Sentencing Memo, at 28-34), killed more than 35,000 Sri Lankans. The Northeast section of Sri Lanka, where the Tamils predominated and LTTE acted as the *de facto* government, suffered the worst. In response, governments and international humanitarian non-governmental organizations (hereinafter "NGO's") rushed aid to the stricken region.

For instance, the Italian government provided post-*tsunami* humanitarian assistance to the Tamils in the Northeast.[9] Similarly, NGO's distributed aid through the Tamil Rehabilitation Organization ("TRO") because it was affiliated with LTTE and could therefore reach the affected areas reliably and efficiently. That process continued even after the immediate aftermath of the *tsunami*. For example, in 2008 TRO's donees included the government of

---

[9] The International Fund for Agricultural Development, http://www.ifad.org/governance/index.htm

Norway, the Danish Refugee Counsel, Operation USA, UNICEF, and CARE International. *See* TRO-Sri Lanka Press Release dated November 19, 2008, Re: Forfeited Funds, attached as Exhibit 3.[10]

The governments and NGO's listed above concluded that the only way the aid would reach the devastated Tamils was by sending it through LTTE or its affiliates.[11] According to Human Rights Watch, UNICEF defended its reliance on TRO by explaining, "[i]n the beginning, we didn't have a lot of choice. We had our backs against the wall. Initially the LTTE wanted the TRO to run the centers."[12] Thus, during the CFA period, because LTTE operated as the unavoidable, *de facto* government in Tamil regions of Sri Lanka, the defendants and others seeking to assist in relief efforts in Tamil locales were forced to work through LTTE and its affiliates.[13]

Indeed, that situation is currently being replayed in Pakistan with respect to aid channeled to areas devastated by recent flooding. As reported by *The Washington Post*, organizations such as Save the Children and the U.N. World Food Program (both of which receive funding from the U.S. Agency for International Development) involved in providing aid to flooded areas of Pakistan have been joined in those locations by Falah-e-Insaniat Foundation, a charity wing of Jamaat-ud-Dawa, a banned organization (in Pakistan) "viewed as a front" for Lashkar-e-Taiba (which has been blamed for the 2008 Mumbai attacks). *See* Karin Brulliard, "U.S. to Send Part

---

[10] Bruce Fein, former Deputy Attorney General of the United States and attorney for Tamils Against Genocide, whom the defendants have engaged as an expert with respect to sentencing, is available to testify, if the Court wishes, at sentencing on any of these matters relevant to the history and current situation regarding the Sri Lankan conflict.

[11] OMB Watch, December 4, 2007, "Tamil Rehabilitation Organization and its U.S. Branch Shut Down," http://www.ombwatch.org/node/3540 (accessed on August 15, 2010).

[12] Human Rights Watch, November 2004, "Living In Fear: Child Soldiers and the Tamil Tigers in Sri Lanka: X - The Action Plan for Children Affected By War," http://www.hrw.org/reports/2004/srilanka1104/11.htm (accessed on August 15, 2010).

[13] Nor is there any evidence (and the government has not provided any) to support the government's accusation, in its Sentencing Memo, at 38-39, that defendants' acts undermined the U.S.'s relations with Sri Lanka, or sabotaged cooperative relations between nations to prevent terrorist attacks. Indeed, defendants' offenses occurred during the CFA period, when LTTE was not an illegal organization in Sri Lanka itself, and it was not a crime under Sri Lankan law to provide material assistance to LTTE. As noted above, a multitude of government-funded and other NGO's provided monetary and humanitarian aid via LTTE during the CFA. Consequently, the government's claim is entirely without foundation.

of Pakistan Aid to Flood Recovery," *The Washington Post*, August 26, 2010 (a copy of which is attached hereto as Exhibit 4).

According to *The Post*, "U.S. officials said . . . they had not been aware of the Islamist charity's role at the camp and *that they have no control over which organizations helped when and where*." *Id*. Yet here, the government would hold defendants to a standard it does not recognize with respect to its own conduct. As a result, the government's contention – that assistance to Tamils, provided via LTTE and its surrogates, in the wake of the *tsunami* was provided with the intent to aid LTTE and its violent, terrorist agenda – is completely controverted not only by the record, but by the practical realities of providing aid in conflict zones in the underdeveloped world.[14]

### E.   *Defendants' Motives and Objectives Are Relevant to Sentencing*

In seeking to limit the Court's focus at sentencing to defendants' offense conduct and Sentencing Guidelines levels, the government abandons all adherence to sentencing jurisprudence as well as to historical perspective. As the Supreme Court and Second Circuit have plainly directed, a District Court *must* consider the relevant sentencing factors set forth in §3553(a), and must tailor its sentence to be "sufficient but not greater than necessary" to achieve the purposes of sentencing enumerated in §3553(a)(2)(A)-(D). *See Gall v. United States*, 552 U.S. 38, 50 (2007); *United States v. Cavera*, 550 F.3d 180, 188 (2d Cir. 2008) (*en banc*).

In this context, defendants' motives and objectives – the full spectrum thereof, and not just that which was sufficient to incur criminal liability – are certainly relevant at sentencing. Indeed, it defies history to adjudge *all* "material support" equally blameworthy. This is not moral relativism or any attempt to deny guilt. Rather, it is simple recognition – as occurs all the time in criminal cases – that some crimes are more or less repugnant than others because of the motives for their commission, and the goals the defendant(s) wished to attain, and that the sentence should reflect that moral judgment.

For instance, Nobel Prize winner Nelson Mandela's African National Congress occasionally targeted civilians in its violent struggle against apartheid in South Africa. According to South African's Truth and Reconciliation Commission, "[i]n the course of the armed struggle [of the African National Congress ("ANC"), by and through its agent, Umkhonto we Sizwe ("MK")], a

---

[14] Similarly, *The Wall Street Journal* reported last month that the U.S. government has been working with the Sudanese government to arrange repatriation of Sudanese nationals confined at the U.S. Naval Base, Guantanamo Bay, Cuba, despite the International Criminal Court's arrest warrant for war crimes lodged against Sudanese President Omar al-Bashir. *See* Jess Bravin, "U.S. Works With Sudan on Gitmo," *The Wall Street Journal*, August 12, 2010 (a copy of which is attached hereto as Exhibit 5). The U.S.'s justification is that somehow its negotiations and agreements with the Sudanese government regarding Guantanamo detainees do not involve President al-Bashir. *Id*.

number of military actions took place which resulted in the death or injury of civilians, and where gross violations of human rights can be said to have been committed…"[15]  Yet would "material support" for the ANC have deserved the same punishment as material support for *al Qaeda*?

Here, even the FBI characterized the conflict in Sri Lanka as a "civil war."[16]  As noted previously, during the CFA period, GOSL treated LTTE as the *de facto* government in Tamil regions, and negotiated with it accordingly.[17]  As even recent history demonstrates, choosing sides in a civil war, which is certainly the prerogative of government (as is penalizing those within its jurisdiction who aid the "wrong" side), can nevertheless be awkward if reduced to a moral imperative.  For example, during the 1980's, the U.S. supported Nicaragua's "Contras" in their insurgency against Nicaragua's ruling Sandanistas despite the Contras's notorious targeting of civilians for violence.  Americas Watch, now a part of Human Rights Watch, declared that "…the *contras* were major and systematic violators of the most basic standards of the laws of armed conflict, including by launching indiscriminate attacks on civilians, selectively murdering non-combatants, and mistreating prisoners."[18]  Yet the CIA still prepared an assassination manual for the Contras.[19]

While not disputing even a syllable of the defendants' chronicle of the GOSL's attempted and systematic genocide of Tamils, which provoked creation of LTTE, the ethnic civil war(s) in Sri Lanka, and defendants' assistance to the LTTE to prevent the extermination of Sri Lanka's Tamils, the government, in its Sentencing Memo, at 38, would erase that essential historical context from the sentencing equation, arguing that "[t]he sentencing of these defendants cannot and should not be used to assess the merits of this dispute [between Tamils and Sinhalese

---

[15] Truth and Reconciliation Commission, October 29, 1998, "Truth and Reconciliation Commission: South Africa Report, Vol. 2," *Government of South Africa*, pg. 326, http://www.justice.gov.za/trc/report/finalreport/Volume%202.pdf (accessed on August 15, 2010).

[16] U.S. Department of Justice, January 10, 2008, "Taming the Tigers From Here in the U.S.," http://www.fbi.gov/page2/jan08/tamil_tigers011008.html (accessed on August 15, 2010).

[17] Majumder, Sanjoy, March 21, 2005, "Sri Lanka's Tsunami Aid Politics," *BBC*, http://news.bbc.co.uk/2/hi/south_asia/4367935.stm (accessed on August 15, 2010).

[18] Americas Watch, 1989, "Nicaragua," http://www.hrw.org/reports/1989/WR89/Nicaragu.htm (accessed on August 15, 2010).

[19] Blanton, Tom, March 14, 2010, "The CIA in Latin America," *GWU*, http://www.gwu.edu/~nsarchiv/NSAEBB/NSAEBB27/index.html (accessed on August 15, 2010).

populations]. Defendants in other cases could similarly ask courts to assess the merits of 'civil wars' in Israel, Afghanistan, Pakistan and Colombia."

But, again, the government confuses two distinct issues: criminal liability and the appropriate punishment for illegal conduct. Concentrating solely on the former, the government fails to address the latter. It is clear, as defendants' guilty pleas demonstrate, that defendants violated the law. What does *not* follow – contrary to the government's one-trick pony argument – is that the punishment for those violations should not, and cannot, be distinguished from other violations that were the product of different motives and different objectives.

Yet that is what judges do *all the time* in sentencing defendants. Otherwise, each offense would have but one sentence that a judge could impose. As the Supreme Court and Second Circuit have both noted in navigating federal sentencing practice since *United States v. Booker*, 543 U.S. 220 (2005), unwarranted *uniformity* for dissimilarly situated defendants is as much to be avoided as the unwarranted disparities condemned by §3553(a)(6). *See Gall*, 552 U.S. at 55; *United States v. Dorvee*, 604 F.3d 84, 97 (2d Cir. 2010).

Here, separating defendants from the inextricable context of their conduct would not serve any of the purposes of sentencing. Indeed, that context provides crucial guidance in determining what punishment will, for each defendant individually, adequately vindicate the public policy underlying §2339B and the four enumerated statutory objectives of sentencing.

Dated: New York, New York
       September 8, 2010

        Respectfully Submitted,

        By: /S/_____

        William J. Stampur, Esq.
        Hurwitz, Stampur & Roth
        299 Broadway, Suite 800
        New York, New York 10007
        Telephone: (212) 619-4240

        Michael H. Sporn, Esq.
        Emma M. Greenwood, Esq.
        299 Broadway, Suite 800
        New York, New York 10007
        Telephone: (212) 791-1200

        ***Attorneys for Defendant Thavarajah Pratheepan***

Charles A. Ross, Esq.
Charles A. Ross & Associates, LLC
111 Broadway, Suite 1401
New York, New York 10006
Telephone: (212) 616-3030


Fran Obeid, Esq.
Obeid & Lowenstein, LLP
111 Broadway, Suite 1401
New York, New York 10006
Telephone: (212) 616-3040

*Attorneys for Defendant Karunakaran Kandasamy*

Susan G. Kellman, Esq.
25 Eighth Avenue
Brooklyn, New York 11217
Telephone: (718) 783-8200

*Attorney for Defendant Vijayshanthar Patpanathan*

Joshua L.Dratel, Esq.
Alice L. Fontier, Esq.
Joshua L. Dratel, P.C.
2 Wall Street, Third Floor
New York, New York 10005
Telephone: (212) 732-0707

*Attorneys for Defendant Nachimuthu Socrates*

Michael A. Marinaccio, Esq.
Culleton & Marinaccio, Esqs.
245 Main Street, Suite 410
White Plains, New York 10601
Telephone: (914) 761-0707

*Attorney for Defendant Murugesu Vinayagamoorthy*

Bruce Fein, Esq.
Bruce Fein & Associates
1025 Connecticut Avenue, N.W., Suite 1000
Washington D.C. 20036

*Of Counsel*

14

TO: LORETTA E. LYNCH, ESQ.
United States Attorney

Attn: Jeffrey Knox, Esq.
Assistant United States Attorney